UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

HECTOR L. VALENTIN,

                    Petitioner,                    **No. 05-CV-0298(VEB)**
          -vs-                                     **DECISION AND ORDER**

WILLIAM MAZZUCA, Superintendent,
Fishkill Correctional Facility,

                    Respondent.
_____

## I.        Introduction

Acting *pro se*, Hector L. Valentin ("Valentin" or "Petitioner") has filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 challenging the constitutionality of his detention in state custody as a result of a conviction on charges of robbery in the first degree (display of a deadly weapon, N.Y. Penal Law § 160.15(4)) and robbery in the second degree (N.Y. Penal Law § 160.10(1)).  The parties have consented to disposition of this matter by a magistrate judge pursuant to 28 U.S.C. § 636(c)(1). For the reasons that follow, the petition is granted in part and denied in part.

## II.       Factual Background and Procedural History

### A.        Overview of the Case

Valentin's conviction stems from the robbery of a stereo-equipment shop in the northwest area of the City of Rochester in Monroe County. An accomplice, Jose Arroyo ("Arroyo") was indicted separately for his alleged involvement in the robbery. Valentin was indicted under an accomplice theory of liability (N.Y. Penal Law § 20.00).

At approximately 10:30 a.m. on February 29, 2000, John Kemp, was, as was his routine, "hanging out" at Mike's Stereo Shop when an individual (later identified as Valentin) entered the store. Valentin inquired of the store clerk, Terrance McLaurin, if he would be interested in purchasing a DJ mixing-board. After McLaurin indicated his possible interest, Valentin left the store, indicating that he would be right back. Petitioner returned with an accomplice (separately indicted co-defendant Jose Arroyo), carrying both a mixing board and a 9-mm handgun. According to Kemp's testimony at Valentin's trial, Valentin placed the handgun a distance of 6 to 7 inches from McLaurin's head and demanded that the cash register be opened. Petitioner then removed currency from the drawer. In response to Petitioner's subsequent demand for merchandise, Kemp removed speakers from the store's display cases and slid them down the counter toward McLaurin. Kemp recalled that Petitioner was telling his companion to "hurry up" during the incident; the two robbers otherwise conversed in Spanish.

As the robbers quickly took their exit, Kemp saw Petitioner, whom he at this point clarified as being the person who had held the gun during the robbery, driving a "maroonish-colored Grand Am" and pulling out of the parking lot.

## B. Pre-Trial Proceedings

Valentin was arraigned on July 19, 2000, and a suppression hearing was scheduled for October 27, 2000. Prior to the hearing, Arroyo's case was dismissed by Justice Kenneth R. Fisher (New York State Supreme Court, Monroe County), after Justice Fisher found that the sole eyewitness, John Kemp ("Kemp"),[1] "did not provide clear and convincing evidence that he had

---

[1]    The store employee and only other eyewitness, Terrance McLaurin ("McLaurin"), failed to appear at Arroyo's independent source hearing.

an independent basis for making an identification of the defendant, Arroyo." Order of Justice

Geraci Denying Valentin's Motion to Set Aside the Verdict Pursuant to C.P.L § 330.30 Motion

("the C.P.L. § 330.30). Order") (citing Order of Justice Fisher Denying Arroyo's Motion to

Preclude Identification Evidence).  As Justice Geraci recounted,

> [Justice Fisher] held that, due to his unreliability, the witness, John Kemp,
> probably should not be sworn to testify at trial. The court found that Mr. Kemp
> did not give a reasonably accurate account of what he had seen. He could not
> describe what happened at the site of the robbery with any consistency, and the
> court had little or no confidence in his reliability as a witness. The witness
> testified as to suffering a blackout because of the stress of the moment and
> described a [previous] serious brain injury that he had suffered in a fall.

C.P.L. 330.30 Order at 3 (citing generally to the Arroyo Order). The prosecution, unable to

proceed without the testimony of McLaurin and Kemp, did not oppose a motion to dismiss the

charges against Arroyo. *Id.* With this development, Valentin was released on bail pending the

*Huntley* hearing.

**B.      Valentin's Trial**

**1.      Eyewitness Terrance McLaurin**

The other eyewitness in addition to Kemp was McLaurin, the employee of the stereo

shop. At the beginning of trial, the prosecutor stated to the judge,

> Mr. McLaurin left the state and then subsequently left, the country, okay? That's
> the chronology of his history. In other words, he's not been – he's been available,
> unavailable, available, and then finally unavailable. And now we have confirmed
> his whereabouts in the Bahamas, okay?

T.71. Thus, McLaurin did not testify at trial. Trial counsel did not seek dismissal of the

indictment based upon McLaurin's non-appearance.

## 2. Eyewitness John Kemp

At trial, John Kemp testified that he was thirty-seven-years-old and had been working as a janitor at the Kodak Office building for about five months as of time of trial. When the robbery occurred, on February 29, 2000 about a year ago, Kemp was on disability due to a brain injury caused by a fall from a ladder. Kemp would go to Mike's Stereo Shop "basically every day" to hang out at the store, which sold stereo equipment for cars, homes, TVs, VCRs, mixing boards, turntables, and so forth. At about 10:30 a.m. on February 29, 2000, McLaurin was working at the store. Kemp had known McLaurin for about 3 to 4 months and said that they were "like friends". T.242. Kemp stated that he used to go in to give McLaurin a "helping hand" and "basically hangout, have somebody to talk to."

At about 12:15 that day, Kemp recalled, "[A] person come [sic] in, asked Terrance if he was interested in buying mixing board, a DJ mixing board. Terrance said yeah. So the person went out, said he would be right back, went out to his car or wherever he went to go get it, came back. When he came back there was two of them. When he entered the store I had my back towards– turned towards them, and when I heard him say give up the $80.00, I thought they made a deal until when he came from behind me and I see what was the robbery was going down." T.242.

What led Kemp to believe there was a robbery occurring was "when [he] seen [sic] the pistol." When asked what kind of pistol it was Kemp stated, "if I had to– a black pistol, maybe a 9-millimeter?" T.243. Kemp testified that it was being pointed at McLaurin's head. From about "[s]ix/seven inches away. T.2543. When Kemp turned and saw this pistol, he said he was "about as close as we are right now", meaning the distance between him and Terrance was

-4-

approximately 10 to 12 feet. T. 244. He described the lighting conditions as "very well lit" as the store had fluorescent lights in the ceiling. The front of the store was glass windows and a glass door. Inside the store looking out he could see the street. T.244.

Kemp testified "there were two different guys. First guy came in, he came in by himself and then when he went out to get the mixing board he brought his friend back with him." T. 245.

Kemp did not know either of the men previously, but he assumed that they were friends. The first man that came in, Kemp described as as "[s]tocky" "Hispanic kid." Kemp testified that he was wearing a black leather coat. Keep your 245 when they came it "back into the store, the first kid that came in, the stocky kid had the mixing board in his hands" T. 246. Ask for a general description of what the second man look like, Kemp said, "thin built, Chinese eyes" and also Hispanic. He estimated their age as in their mid-20s. The first man had the gun pointed at Terrance's head.

When asked where the second man was and what he was doing, Kemp testified that when he turned around he thought they had made a deal, "so they were both standing right next to Terrance but when they made their – when they came up towards the cash register – the person who had the gun had [sic] it to Terrance, then the other kid was standing right next to me." T. 247, Kemp testified that he had an opportunity to look at the face of the first man. It was not obstructed by any kind of hat or mask or glasses.

When the second man came in with the first man, Kemp testified that the second man was not holding anything. When asked for the exact words he heard from the first man towards Terrance, he said "I know they were talking about the mixing board so I thought they made a deal he said give up the money so I just thought they made a deal you know, until I realized what was

happening." T.248. While the first man had a gun pointed at McLaurin's head, he told McLaurin "to open the fucking register." T.248. McLaurin replied, "you open it." T. 249. The first man then opened the register, "took a few bucks out, and then said give up the merchandise." While this was occurring he still had the pistol. Kemp then walked around behind the counter, opened up the case, and took car amplifiers out (about four or five), and a car stereo, and slid them down the counter. McLaurin gave them to the first man. T.249-250.

Kemp identified the "first man", the man who had the gun, as Valentin. T.254-55. Kemp testified that the first man took the merchandise and gave it to person number two. T.250. Kemp related, "Number one was saying to number two to hurry up, hurry up something like that, come on, come on." T.251 The pistol was still being pointed by person number one (Valentin) at McLaurin. Then the two men began talking in Spanish so Kemp could not understand what they were saying.

Almost immediately after that they turned around and "walked pretty fast," T.253, out of the store.  The number two robber left first with number one right behind him. T.252 Kemp recalled that when they "exited the store they made a right to the parking lot." T.252. The parking lot was on the same side of the street as the stereo shop. Kemp observed the first man, whom he identified as Valentin, driving a "maroonish-colored Grand Am" and pulling "[v]ery, very fast" out of the parking lot. T.255.

On cross-examination, trial counsel questioned Kemp extensively about his identification testimony from the Arroyo matter. The documents signed by Kemp indicated that he gave a statement to police a few days after the incident, following his attendance of an identification procedure at the police station, in which he identified Arroyo as a participant in the robbery.

T.281. Trial counsel sought to show that Kemp had identified Arroyo as the gunman, but Kemp stated that he was just "attempting to pick out the two people who were involved in the incident." T.281. Kemp maintained that he had never said, on any occasion, that the photograph he picked out (i.e., of co-defendant Arroyo) was the gunman. T.282. Kemp stated that he looked through photographs and identified one (Arroyo) who was involved in the robbery. T.283. Trial counsel introduced Kemp's statement to the police at that time in which he said, "Investigator Murphy told me the person I identified was named Jose Arroyo." T.285.

Trial counsel also attempted to impeach Kemp with his testimony at the independent source hearing before Justice Fisher in the Arroyo matter. Trial counsel got him to admit that he did say that he had gone into the police department and viewed the photographs "in an attempt to identify the gunman." T.286. Thus, trial counsel sought to show that since Kemp had only identified one person (Arroyo), and since he had testified that he was identifying the gunman during the photo array, therefore, he had identified Arroyo as the gunman.

When questioned about his brain injury, Kemp testified that it was not severe and that although he had not taken his medication on the day of the robbery, he had no seizure and did not black out. T.291. He admitted to being "a little nervous" and to saying previously that he "felt a seizure coming on when [he] saw the gun . . . ." T.292. Trial counsel confronted Kemp with his testimony at the hearing before Justice Fisher that he almost had a seizure while the robbery was happening, that before he has a seizure, he starts to shake badly and starts to black out. T.292. In that testimony, he denied to Justice Fisher that his vision started to cloud over a bit, stating that, "I know one thing, you're going to put a gun in your [sic] face and I'm gonna make sure I look at and know who you are." T.293.

Trial counsel got Kemp to admit that he had "tremors or shakes". Kemp stated, "I didn't blackout." T.293. Trial counsel pointed out that Kemp was shaking presently; Kemp stated, "I always shake." T.294.

Kemp maintained that in the proceeding before Justice Fisher, he was there to identify "person number two" and he commented, "I believe his name was Jose Arroyo or something like that." T.309.

Trial counsel confronted Kemp with his testimony before Justice Fisher when the judge asked him, "do you recall how it was as you were viewing the monitor [displaying the photographs] that you came to pick out an individual as the person who had the gun." T.306. Kemp said yes, and described the procedure of how he viewed the photographs. Kemp repeatedly stated, "I don't believe so" when trial counsel asked him if he told Justice Fisher that he was "ninety percent certain that that [i.e. Arroyo] was the person was the gun." T.302. However, Kemp finally admitted to that statement, and confirmed that Valentin was the person he picked out on the computer monitor. T.307.

On re-direct, and re-re-direct examination, Kemp testified that he did not have a seizure during the incident and "was coherent through the whole thing." T.308. He explained that he only needed glasses for reading, not for distance. T.308. Kemp stated that failure to take his medication only results in migraine headaches; it does not affect his vision or memory. T.309.

Kemp also explained that he did not think he was identifying "the gunman" during the photo array procedure but rather believed that he was supposed to pick out anyone who looked like either of the two robbers. T311-12. When he saw Arroyo's picture, he said to the officer, "that's one of them there, that's all." T.312. He reiterated that Arroyo was "person two" as

described in his narrative of the robbery–that is, the robber who did not have the gun. T.314-15. With regard to the questioning before Justice Fisher, Kemp explained that it was the judge who said that the person identified in the photo array was Arroyo; Kemp testified, "I never said it [the photo he identified] was the gunman . . . ." T.324.

Kemp admitted to trial counsel that had agreed with Justice Fisher's statement that the person he identified during the photo array was the gunman. T.325.

### 3.   Petitioner's Former Girlfriend, Sarah Bower

Twenty-one year old Sarah Bower, Valentin's former girlfriend who at one point resided with him, saw him twice on the day of the robbery–once, briefly in the early afternoon when Petitioner stopped by at Cordello's Pizzeria where Bower worked, and again, later in the afternoon when Petitioner picked Bower up after work. *See* T.340-42. According to Bower, Valentin was driving a red Pontiac Grand Am filled with various pieces car stereo equipment–a "pretty loaded" system. T.342.

About one week after the robbery, Bower and Petitioner went to the corner store in the plaza which also contained Mike's Stereo Shop. T.343. They were driving Bower's car. Petitioner told Bower not to park the car, saying to her, "'Don't pull up, don't go to the store, don't pull up in here, I robbed the store last week, I don't want to be seen [sic] around here, these people see me through the window'– a whole bunch of the same stuff." T.350. "Basically, he didn't want to be seen there, he did not want my car to be there, he did not want my car to be there, he did not want to be seen. He did not even want to be around that area on that corner. *Id.*

According to Bower, Petitioner stated, "I can't be around this store, this is the store I robbed last week, I robbed that store the same day I met you, how do you think I got my stereo

stuff, we have to get away from here, we have to get out of here, I can't be seen by these people." T.351.  When asked to describe how Valentin had described he had robbed the store, Bower replied, "He just held them up." T.351. Bower testified that she "didn't really ask" but said that "[h]im and another person had went [sic] in there and held them up by [sic] the gun and –." T.351. When asked what, if any weapon, did Valentin refer to, Bower stated, "It wasn't mentioned. Held them up by [sic] gunpoint. I mean, not a particular weapon in particular. I didn't really ask, either." T.352. Bower said that she did not k now "in particular which person had the gun, but [she] was told they were together." T.353.

Bower recalled Petitioner had informed Bower about the robbery on the same day of the incident, during the first of the two occasions that he had stopped by the pizza parlor where Bower worked. Bower said, "[Petitioner] had actually told me that he robbed them, then came straight from there over to my job directly."

### 4.  **Investigators Cotsworth and Mace**

Investigators Cotsworth and Mace of the Rochester Police Department interviewed Valentin as a suspect in the stereo-shop robbery on April 27, 2000. T.379. Valentin waived his *Miranda* rights. T.380-386. Initially, Valentin stated that he "wasn't involved in anything" and had "nothing to hide." T.388. Investigator Cotsworth said that after being confronted with some facts that had been developed, Valentin then "admitted to being there during the robbery." T.389. Investigator Mace testified that Valentin explained that "he was at the A Plus gas station at Dewey and Flower City Park when a guy he knows as Karl walked up, asked him if he knew where he could sell a stereo mixer or asked him if he wanted a stereo mixer. [Valentin] said no, he didn't need one. He asked him where he could sell it, and Hector told him a pawn shop. So the

male named Karl told him that if Hector gave him a ride to the pawn shop he would smoke a tree with him, meaning smoke some marijuana." T.408.

Valentin told the investigators that he drove "Karl" home; "Karl" picked up the stereo mixer; and bought a bag of marijuana from some dealer on the street. T.408–09. Then Valentin drove him to the pawn shop (i.e., Mike's Stereo Shop) on Dewey. T.409. Apparently "Karl" spoke Spanish.

While "Karl" was asking the employee how much the mixer was worth, the employee told him to go get the mixer. When "Karl" returned with the mixer, Valentin "heard Karl say, go to the register right now" to the employee. T.409. When Valentin turned around, "Karl was holding what he believed was a black 9 millimeter handgun on the employee, and that the employee took the cash out of the register." T.409.

"Karl" handed the mixer to Valentin and Valentin left the store. T.414. "Karl" came over to Valentin's car and said, "Let's get out of here" so Valentin "dropped his ass off at his house and [they] started arguing." T.414. "Karl" told Valentin "not to say anything, and he gave [him] the mixer for [his] problems." T.414. According to Valentin, the mixer eventually was stolen out of his car. T.414-15.

The investigators showed Valentin a picture of Arroyo, but Valentin denied that the picture depicted "Karl." T.410. Investigator Mace said that when shown the picture of Arroyo, Valentin became "very nervous" and "appeared to be surprised" that the police had a photograph of Arroyo, and that Arroyo had already been arrested and placed in custody. T.411. Valentin ultimately admitted that he knew Arroyo from the neighborhood.

## C.    The Jury Verdict

The jury was instructed regarding the accomplice liability statute, N.Y. Penal Law 20.00, which provides that a person is criminally liable for another's conduct when, acting with the mental culpability required for the commission thereof, he solicits, requests, commands, opportunes, or intentionally aids such person to engage in the criminal conduct. T.507-08. Two counts of robbery were submitted to the jury. The first was robbery in the first degree, under a theory of forcible stealing accomplished by the display of what appears to be a pistol, revolver, rifle, shotgun, machine gun or other firearm. T.510-11. In the second count of the indictment, Valentin was charged with robbery in the second degree. The jury was instructed that person is guilty of that offense when a person forcibly steal property and when that person is aided by another person actually present, in that the person is in a position to render immediate assistance to another person participating in the robbery, and is ready, willing, and able to do so. T.511-12.

Deliberations began at about 1 p.m. The jury sent out a note during deliberations which read as follows: "Clarity. If we agree he was there, whether willing or not, a robbery took place, a gun was used. Whether he had the gun or not, he left with merchandise not theirs. Do we rule guilty on both, or one or the other? Do we have to prove intent." T.529. In response the trial judge re-read Section 20.00, the accomplice liability language; and instructed the jury to consider both charges. T.531. The jury deliberated for another hour, they returned at 5:12 with their verdict. T.536-37. Deliberations lasted for approximately four hours and fifteen minutes. The found Valentin guilty of both counts of robbery.

### D. The C.P.L. § 330.30 Motion to Set Aside the Verdict

After the verdict, trial counsel moved pursuant to C.P.L. 330.30(1) and (3) to set aside the verdict and obtain a new trial. Valentin alleged that the prosecution failed to provide

"*Rosario* materials"[2]–specifically that "the primary prosecution witness, John Kemp, had a criminal record consisting of a felony conviction for Sexual Abuse in the First Degree." C.P.L. § 330.30 Order at 1, attached as part of Respondent's Appendix "C".[3]

The prosecutor opposed the motion on the basis that there was no *Rosario* violation inasmuch as he had "no actual knowledge of the witness' prior conviction" because "he did not ask and the witness did not volunteer the information." C.P.L. 330.30 Order at 2.

After the motion was filed, the prosecutor confirmed that Kemp in fact had been convicted of Sexual Abuse in the First Degree on January 21, 1982, and, additionally, had another conviction for Sexual Abuse in the First Degree in Monroe County Court on December 31, 1981; a misdemeanor conviction for Endangering the Welfare of a Child in Rochester City Court on May 18, 1988; and a misdemeanor conviction for Criminal Mischief in the Fourth Degree on May 24, 1999. *Id.*

On March 7, 2001, the trial court heard oral argument on the C.P.L. 330.30 motion. The

---

[2] In *People v. Rosario*, 9 N.Y.2d 286, 213 N.Y.S.2d 448, 173 N.E.2d 881 (N.Y. 1961), the New York Court of Appeals "anticipated *Brady* [*v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963)] in holding that suppression of evidence favorable to the accused violates due process." *Lyon v. Senkowski*, 109 F. Supp.2d 125, 139 (W.D.N.Y. 2000) (Larimer, D.J.). "The *Rosario* rule 'is grounded in the State's common law.': *Morrison v. McClellan*, 903 F. Supp. 428, 429 (E.D.N.Y. 1995) (quoting *United States ex rel. Butler v. Schubin*, 376 F. Supp. 1241, 1247 (S.D.N.Y.1974), aff'd without opinion, 508 F.2d 837 (2d Cir.1975); citation omitted). "Although it is generally considered to be New York's counterpart to a federal rule based on *Jencks v. United States*, 353 U.S. 657, 77 S.Ct. 1007, 1 L.Ed.2d 1103 (1957), *see* 18 U.S.C. § 3500, the *Jencks* rule has not been construed as constitutional in nature." *Morrison*, 903 F. Supp. at 429 (citing *Palermo v. United States*, 360 U.S. 343, 345, 79 S.Ct. 1217, 1221, 3 L.Ed.2d 1287 (1959)).

 "*Rosario* went beyond requirements later defined in *Brady* and its progeny, holding that a prosecutor must disclose any prior statement of its witness, regardless of whether it is favorable to the accused." *Lyon v. Senkowski*, 109 F. Supp.2d at 139. Thus, to the extent that it exceeded federal constitutional requirements, *Rosario* defines state law and is not a basis for a federal habeas claim. *Id.* (citing Practice Commentary to CPL § 240.25 (McKinney's) on the difference between state disclosure requirements under Rosario and Federal requirements under *Brady*); *accord*, *e.g.*, *Morrison*, 903 F. Supp. at 429.

[3] In addition, Valentin argued that the trial court erroneously failed to grant the defense request for a jury instruction that he acted under coercion or duress. The resolution of this claim need not be discussed further herein because Valentin has not raised it as a ground for habeas relief.

trial court vigorously questioned the prosecutor about his awareness of his legal obligations under *Brady* and the deficiencies of the People's proof against Valentin. *See* Transcript dated March 7, 2001 ("the C.P.L. 330.30 Tr.") at 4-14. The trial court stated that it would reserve decision, noting that the case was "obviously very disconcerting . . . ." C.P.L. 330.30 Tr. at 16. The trial court was particularly concerned that the co-defendant's case had been dismissed; that the other eyewitness, McLaurin, had fled the jurisdiction and was refusing to cooperate; and the only witness who testified that Valentin was the gun man turned out to be a double predicate felon with three misdemeanor convictions about which the jury never heard. *Id.* at 16-17. The trial court observed that in the "courtroom seeks to seek truth as best [it] can, and in this case it appears, um, that that wasn't done. There was not a truth seeking mission. We need to address that." *Id.* at 17. Accordingly, the trial court reserved decision and indicated that it would issue a written order.

In its written decision and order, the trial court agreed that the prosecutor correctly stated that defense counsel never specifically requested that he be provided with any criminal history of John Kemp. Furthermore, there was "no evidence" that the prosecutor "had any actual knowledge of the conviction[s]." C.P.L. 330.30 Order at 6. However, the trial court noted, it was "very troubled by the history of the case" for the following reasons:

> [T]he co-defendant's case was dismissed after one of the complaining witnesses, Terry [sic] McLaurin failed to appear at a hearing and subsequently indicated his desire not to cooperate in the prosecution of this case. This is the witness who testified before the Grand Jury that the co-defendant, Jose Arroyo, had placed a gun to his head and that the second individual involved in the robbery, this defendant Hector Valentin, did not possess a handgun. Additionally, when the second witness to the robbery, John Kemp, testified before Supreme Court Justice Kenneth R. Fisher, his testimony regarding the identification of Jose Arroyo was found to be not credible. In fact, Justice Fisher went further and indicated in his

order that the witness, John Kemp, was so unreliable due to lack of recall and a brain injury that he had suffered, that he should not be allowed to testify at any subsequent proceedings. Due to these proceedings in Justice Fisher's court, the charges against Mr. Arroyo were dismissed because the People had insufficient evidence to proceed further.

Undeterred, the People plowed full steam ahead in its [sic] prosecution of Hector Valentin. Even in light of Justice Fisher's ruling regarding the reliability of Mr. Kemp and the People's knowledge that Mr. Kemp intended to testify contrary to the other eyewitness to the robbery [i.e., McLaurin], specifically regarding the possession of the weapon during the robbery, the prosecutor [Assistant District Attorney Daniel Majchrrzak, Jr., Esq.] announced that he did nothing to attempt to test his witness' credibility. He stated that he did not ask him whether, or not, he had a criminal record, because it is his practice not to ask such information from his witnesses, and that it was common for witnesses to provide different versions of the facts[;] therefore, it did not concern him that the witness' version varied on a significant issue, to wit, who placed a gun to the head of the victim complainant Terrance McLaurin. The prosecutor relied upon corroborating evidence that the defendant provided a statement to the police regarding his presence at the scene of the robbery, and a statement he had made to his girlfriend, Sarah Bower, about his involvement in that incident.

C.P.L. 330.30 Order at 6-7.

The trial court went on to analyze the claim concerning Kemp's criminal record under *People v. Vilardi*, 76 N.Y.2d 67 (N.Y. 1990), in which the New York Court of Appeals elected to apply a more lenient standard of materiality than that articulated by the Supreme Court in *United States v. Bagley*, 473 U.S. 667, in the context of a *Brady* claim. The Supreme Court held in *Bagley* that the same materiality standard should apply regardless of whether a defendant has specifically requested disclosure of certain exculpatory or impeaching evidence from the prosecutor. *Vilardi*, 76 N.Y.2d at 72. A deeply divided Supreme Court in *Bagley* held that undisclosed evidence is material only if there is a "reasonable probability" that it "would" have altered the outcome of the trial. 473 U.S. at 682. A reasonable probability is "a probability sufficient to undermine confidence in the outcome." *Id.* The majority opined that this standard

-15-

was "sufficiently flexible" to cover both the "specific request" and "no request/general request" cases. *Id.*

In *Vilardi*, the New York Court of Appeals declined to follow *Bagley*'s less protective approach explaining,

> Rather than giving more serious consideration to specific requests both because of the greater degree of notice they provide, and out of reasons of fairness and prosecutorial misconduct, in *Bagley* the court jettisoned such considerations in favor of a single standard, which in some undefined measure may–or may not–include adverse consequences in the specific request context.

*People v. Vilardi*, 76 N.Y.2d at 75 (citing Note, Specific Requests and the Prosecutorial Duty to Disclose Evidence: The Impact of *United States v Bagley*, 1986 Duke L. J. 892); *see also id.* at 77. The *Vilardi* court reaffirmed its prior precedents that, as a matter of state constitutional law, a showing of a "reasonable possibility" that the failure to disclose exculpatory or impeaching evidence contributed to the verdict "remains the appropriate standard to measure materiality, where the prosecutor was made aware by a specific discovery request that defendant considered the material important to the defense." 76 N.Y.2d at 77.

It is unclear why the trial court mentioned *Vilardi* in this case, because, unlike the facts in *Vilardi*, there was *no* specific discovery request by defense counsel of any witness' prior convictions. Thus, as a matter of state law, the appropriate standard was the "reasonable probability" standard–which is the same as the *Bagley* standard that the Supreme Court applies to both specific request and general/no request cases. At the end of the day, the trial court did not apply either materiality standard, instead concluding that because the prosecutor was unaware, before or at the time of trial, of the witness' criminal record, the failure to disclose it did not violate the New York state discovery rule as stated in *Rosario* or a prosecutor's due process

obligation under *Brady*. C.P.L. 330.30 Order at 8. The trial court stated,

> Although it is disturbing to this court that the jury did not have two (2) significant pieces of information, first, that the witness, John Kemp, was twice convicted of a felony and had three misdemeanor convictions, and second, that his testimony varied considerably from that of the only other eyewitness [i.e., McLaurin, who did not testify at Valentin's trial] to the event, *in light of the prosecutor's lack of actual knowledge of the witness' criminal history*, the court cannot conclude that any violation of *Rosario* or *Brady* occurred. Therefore, the defendant, Hector Valentin, is without remedy. The motion to set aside the verdict on this ground is denied.

C.P.L. 330.30 Order at 8 (emphasis supplied).

### E.  Sentencing

Valentin faced a determinate sentence of having a minimum of 5 years and a maximum of 25 years. He received a determinate term of 6 years in state prison.

### F.  The Direct Appeal

On direct appeal, Valentin pursued his *Brady* claim, originally raised in the C.P.L. 330.30 motion, concerning the prosecutor's failure to disclose Kemp's criminal record. The Appellate Division held that the trial court had erroneously concluded that the prosecutor had not violated his due process obligation under *Brady*. *People v. Valentin*, 1 A.D.3d 982, 982, 767 N.Y.S.2d 343, 344 (App. Div. 4th Dept. 2003). Notwithstanding that, the Appellate Division held, the suppression of Kemp's criminal record was not material to Valentin's conviction because there was not a "reasonable probability" of a more favorable outcome had Kemp been impeached with his prior convictions. The Appellate Division explained,

> It is not determinative that the prosecutor denied any contemporaneous actual knowledge of the eyewitness's criminal convictions as a consequence of his self-professed standard practice of not checking into such matters. "The requirement that the *Brady* material be in the People's possession or control has not been interpreted narrowly". "A prosecutor must 'learn of any favorable

evidence known to the others acting on the government's behalf in the case' and promptly disclose any such material evidence to the defendant". Here, the criminal record of the eyewitness [Kemp] was readily available to the prosecutor and certainly known to other individuals in his office who recently had prosecuted the eyewitness. We nonetheless conclude under the circumstances of this case, in which there was no specific request for the exculpatory material in question, that there is no "reasonable probability" that the verdict would have been different had the material been disclosed to the defense and presented to the trier of fact.

*People v. Valentin*, 1 A.D.3d at 983, 767 N.Y.S.2d at 344 (internal quotations and citations omitted).

The New York Court of Appeals summarily denied leave to appeal on January, 29, 2004.

*People v. Valentin*, 1 N.Y.3d 602, 808 N.E.2d 369, 776 N.Y.S.2d 233 (N.Y. 2004).

### G. The C.P.L. § 440.10 Motion to Vacate the Judgment

About five months after the completion of his direct appeal, Valentin filed a *pro se* motion to vacate the judgment pursuant to C.P.L. 440.10 on the basis that there was a second *Brady* violation with regard to Sarah Bower and that there existed newly discovered evidence of his innocence.

The *Brady* claim pertained to an arrest warrant outstanding for Bower prior to trial. Valentin recounted that after trial, he obtained copies of a police report dated January 3, 2001, stating that Bower had entered Cordello's Pizzeria, her former place of employment, walked around the counter, and took money ($56.00) out of the cash register. When an employee confronted her with the theft, Bower ran out of the store. After the employee filed a criminal complaint, a detective with the Rochester Police Department wrote a warrant request for her immediate arrest on probable cause. The criminal complaint was filed in Rochester City Court on January 3, 2001, alleging the crime of petit larceny had been committed by Bower. A warrant for

Bower's arrest in connection with this matter was issued by a Rochester City Court judge on January 16, 2001, and Bower was arrested on March 25, 2001, and arraigned on March 26, 2001. After missing a May 2001 court appearance, Bower pled guilty on July 23, 2001, to one count of disorderly conduct in satisfaction of the criminal complaint charging petit larceny. Valentin's trial commenced on January 9, 2001, and was completed two days later on January 11, 2001. Thus, Bower had not been arrested or arraigned prior to Valentin's trial.

In support of the claim of newly discovered, Valentin submitted an affidavit from one Richard Rolfe ("the Rolfe Aff."), the original title-holder of the maroon-colored Pontiac Grand Am–the getaway car driven by Valentin and the vehicle in which Bower testified that she saw items of stereo equipment that Valentin identified to her as stolen. Rolfe, a former housemate of Valentin's, claimed that he had purchased the car for Valentin for unspecified "work related use". Rolfe averred that he was the owner of the speakers that Bower said had been stolen because the speakers had been "factory installed" and were therefore part and parcel of the car and could not be stolen property. Rolfe, however, failed to establish that the speakers, which Bowers identified at trial, were his. Moreover, such a conclusion cannot be gleaned from the trial transcript. *See* People's Answering Affirmation to C.P.L. 440.10 Motion at 3, Resp't App. "O".

The judge who had presided over Valentin's trial denied relief under C.P.L. 440.10, without an evidentiary hearing, in a written decision and order entered February 11, 2005. *See* C.P.L. 440.10 Order, Resp't App. "Q".

With regard to the *Brady* claim, the trial court noted that at the time of her testimony at Valentin's trial, Bower merely stood accused of having committed the crime of petit larceny and, indeed, had not yet been arrested or arraigned on that criminal complaint. C.P.L. 440.10 Order at

4, 5. As noted above, Bower was not arraigned until over three months after the completion of Valentin's trial. She was not convicted until four months after Valentin's sentencing, when she entered her guilty plea in July 2001, to the lesser charge of disorderly conduct, a violation. *Id.*

The trial court went on to find that the prosecutor did not have actual knowledge of the criminal matter involving Bower, nor could knowledge be imputed to him. The trial court held that Valentin failed to show either that the police officers who investigated the Bower incident were aware of any connection between Bower and Valentin, or that the prosecutor was aware of the pending petit larceny complaint against Bower. C.P.L. 440.10 Order at 6. Even if knowledge could be imputed to the prosecutor, the trial court held, in the absence of any specific request for the impeachment material by Valentin's trial counsel, there was "no reasonable probability that a verdict would have obtained had the existing of the pending charge been disclosed to the defense." *Id.* (citation omitted).

With regard to the claim of newly discovered evidence, the trial court held that neither the existence of a pending criminal action against Bower nor the statements by Rolfe concerning the speakers constituted "newly discovered evidence". *Id.* at 6-7 (citing, *inter alia*, *People v. Salemi*, 309 N.Y. 208, 216 (N.Y. 1955) ("The test thus enunciated was long ago approved in this court, and since followed–*viz.*: that 'Newly-discovered evidence in order to be sufficient must fulfill all the following requirements: 1. It must be such as will probably change the result if a new trial is granted; 2. It must have been discovered since the trial; 3. It must be such as could have not been discovered before the trial by the exercise of due diligence; 4. It must be material to the issue; 5. It must not be cumulative to the former issue; and, 6. It must not be merely impeaching or contradicting the former evidence.'") (quotation omitted), *cert. denied sub nom.*, *Salemi v. State*

*of New York*, 350 U.S. 950 (1956)); *accord*, *e.g.*, *People v. Casillas*, 289 A.D.2d 1063, 1064, 736 N.Y.S.2d 207, 210 (App. Div. 4th Dept. 2001). In particular, the trial court noted, the pending petit larceny charge against Bower merely constituted impeachment material. With regard to the Rolfe Affidavit, the trial court held that it contained both conclusory and speculative allegations and, as such, failed to establish Rolfe's ownership of the speakers at issue. Furthermore, in view of the friendly relationship between Valentin and Rolfe, Valentin certainly could have discovered the information with exercise of due diligence prior to trial. Thus, each alleged item of newly discovered evidence was fatally lacking at least one of the requirements set forth by *People v. Salemi*.

Petitioner's application for review of the denial of the C.P.L. § 440.10 motion was denied by the Appellate Division.

### G. The Federal Habeas Petition

Valentin's habeas petition (Docket No. 1) in this Court was timely filed. As grounds for relief, he asserts the following: (1) *Brady* violation with regard to Kemp (Petition, para. 22(A); (2) *Brady* violation with regard to Bower (Petition, para. 22(B)); (3) continued allegations regarding Bower claim (Petition, para. 22(C)); continued allegations regarding Bower claim (Petition, para. 22(D)); and (5) due process violation based upon newly discovered evidence (i.e., Bower's pending petit larceny complaint) (Petition, para. 22(E).

Respondent submitted an answer and memorandum of law in opposition to the petition (Docket Nos. 10-1, 10-2 & 10-3), along with the pertinent state court records. Petitioner filed an affidavit in reply to respondent's answer (Docket No. 11).

As discussed below, after carefully reviewing all of the parties' pleadings and the relevant

state court records, the Court has determined that the petition should be granted with respect to Valentin's *Brady* claim concerning the non-disclosure of Kemp's criminal record. The remaining claims in the petition are denied.

## III.    Subject Matter Jurisdiction

During the pendency of this petition, Valentin was released after serving most of of his six-year determinate sentence. Valentin's petition has not been mooted by his discharge from incarceration, however,

"The federal habeas statute gives the United States district courts jurisdiction to entertain petitions for habeas relief only from persons who are ' in custody in violation of the Constitution or laws or treaties of the United States.'" *Maleng v. Cook*, 490 U.S. 488, 490, 109 S.Ct. 1923, 104 L.Ed.2d 540 (1989) (quoting 28 U.S.C. § 2241(c)(3) (emphasis in original) and citing 28 U.S.C. § 2254(a)). The Supreme Court has "interpreted the statutory language as requiring that the habeas petitioner be 'in custody' under the conviction or sentence under attack at the time his petition is filed." *Maleng*, 490 U.S. at 490-91, 109 S.Ct. 1923 (citing *Carafas v. LaVallee*, 391 U.S. 234, 238, 88 S.Ct. 1556, 20 L.Ed.2d 554 (1968)). Here, Valentin has been released from prison and is under parole supervision. However, at the time he filed his habeas petition, he was incarcerated. Therefore, he fulfills the "in custody" requirement of 28 U.S.C. § 2254**.**

The next question is whether Valentin's petition presents a "live case or controversy," Article III, Section 2 of the United States Constitution, for this court to review. Article III, Section 2 of the Constitution limits the subject matter of the federal courts to cases that present a "case or controversy." *E.g.*, *Spencer v. Kemna*, 523 U.S. 1, 7, 118 S.Ct. 978, 140 L.Ed.2d 43 (1998); *accord*, *e.g., United States v. Mercurris*, 192 F.3d 290, 293 (2d Cir.1999). "Thus, where

the issues presented by a party in an action are no longer 'live,' or the party lacks a legally cognizable interest in the outcome, the federal action is properly dismissed as moot." *City of Erie v. Pap's A.M.*, 529 U.S. 277, 287, 120 S.Ct. 1382, 146 L.Ed.2d 265 (2000). "[T]o satisfy the case-or-controversy requirement, a party must, at all stages of the litigation, have an actual injury, which is likely to be redressed by a favorable judicial decision." *Mercurris*, 192 F.3d at 293 (citing *Spencer*, 523 U.S. at 7, 118 S.Ct. 978). "[I]f an event occurs during the course of the proceedings or on appeal that makes it impossible for the court to grant any effectual relief whatever to a prevailing party, [the court] . . . must dismiss the case." *United States v. Blackburn*, 461 F.3d 259, 261 (2d Cir.2006) (internal quotation marks and citations omitted).

However, "[a] criminal case does not necessarily become moot when the convict finishes serving the sentence" but rather "the case will remain a live case or controversy if there exists 'some concrete and continuing injury' or 'collateral consequence' resulting from the conviction." *Mercurris*, 192 F.3d at 293 (quoting *Spencer*, 523 U.S. at 7, 118 S.Ct. 978). Where the defendant challenges the criminal conviction itself, the Supreme Court "has been willing to presume the existence of collateral consequences sufficient to satisfy the case or controversy requirement; or in a practice that it views as 'effectively the same,' the Court has been willing 'to count collateral consequences that are remote and unlikely to occur.'" *United States v. Probber*, 170 F.3d 345, 348 (2d Cir.1999) (emphasis in original) (quoting *Spencer*, 523 U.S. at 8, 118 S.Ct. 978). This presumption of collateral consequences was articulated in *Sibron v. New York*, 392 U.S. 40, 54-56, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968), where the Supreme Court noted that "most criminal convictions do in fact entail adverse collateral legal consequences," such as deportation, inability to become a citizen, the use of the conviction impeachment evidence in future criminal

trials, being barred from holding certain offices, voting in state elections, serving as a juror, and having the conviction used to enhance future prison sentences.

"After *Sibron*, a habeas petition challenging a criminal conviction is rendered moot by a release from imprisonment 'only if it is shown that there is no possibility that any collateral legal consequences will be imposed on the basis of the challenged conviction.'" *Perez v. Greiner*, 296 F.3d 123, 125 (2d Cir.2002) (quoting *Sibron*, 392 U.S. at 57, 88 S.Ct. 1889)). The Supreme Court has stated that a challenge to the conviction itself carries the presumption that a collateral consequence, such as parole or probation, exists. *Spencer v. Kemna*, 523 U.S. at 8. At the present time, Valentin continues to bear certain adverse collateral consequences of his criminal conviction in terms of continuing restraints on his liberty–that is, his conditional release from incarceration to parole supervision. Therefore, I find that the petition is not presently moot. *See*, *e.g.*, *Plato v. Morrissey*, 638 F. Supp.2d 338, 343 (W.D.N.Y. 2009) (order of Siragusa, D.J., adopting report and recommendation of Bianchini, M.J.) (holding that petition was not moot, where petitioner continued to bear adverse collateral consequences of his criminal conviction in terms of continuing restraints on his liberty, namely, conditional release to parole supervision).

**IV.      Exhaustion**

"Before a state prisoner may obtain a writ of habeas corpus from a federal court, the prisoner must exhaust his remedies in state court." *Jimenez v. Walker*, 458 F.3d 130, 148 (2d Cir. 2006) (citing 28 U.S.C. § 2254(b)(1); *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999). "The exhaustion requirement 'is principally designed to protect the state courts' role in the enforcement of federal law and prevent disruption of state judicial proceedings,'" *id.* (quoting *Rose v. Lundy*, 455 U.S. 509, 518 (1982)). Generally, it "'is not satisfied unless the federal claim

has been "fairly presented" to the state courts,'" *id.* (quoting *Daye v. Attorney Gen'l of N.Y.*, 696

F.2d 186, 191 (2d Cir.1982) (*en banc*)). Section 2254(b)(1) provides that

> (b)(1) An application for a writ of habeas corpus on behalf of a person in custody
> pursuant to the judgment of a State court *shall not be granted* unless it appears
> that–
> (A) the applicant has exhausted the remedies available in the courts of the State;
> or
> (B) (i) there is an absence of available State corrective process; or
>      (ii) circumstances exist that render such process ineffective to protect the
>      rights of the applicant.

28 U.S.C. § 2254(b)(1) (emphasis supplied).

Respondent argues, without citing any apposite cases, that Valentin's claims regarding

*Brady* violations in connection with Kemp and Bower are unexhausted because Valentin's

appellate counsel cited to a number of New York state counterparts to the Supreme Court's

decision in *Brady*; and only cited to *Brady* but did not cite to any of the Supreme Court's cases

leading up to or following *Brady*. This argument lacks merit.

The exhaustion requirement requires the petitioner to have "fairly presented" to the state

courts "both the factual and legal premises of the claim he asserts in federal court." Jones v.

Keane, 329 F.3d 290, 294-95 (2d Cir.2003). The key inquiry in the exhaustion analysis is

whether "the nature or presentation of the claim [was] likely to alert the court to the claim's

federal nature." Daye v., 696 F.2d at 192. Apart from citing a specific constitutional provision,

which clearly alerts the state courts to the federal dimensions of the claim, a petitioner may also

be considered to have fairly presented his claim to the state courts where he (a) relies on pertinent

federal or state cases employing constitutional analysis, (b) asserts the claim  in terms so

particular as to call to mind a specific right protected by the Constitution, or (c) alleges a pattern

of facts that is well within the mainstream of constitutional litigation. *Ramirez v. Attorney General of New York*, 280 F.3d 87, 94-95 (2d Cir.2001) (citing *Daye*, 696 F.2d at 194).

When Valentin's trial counsel first raised the Kemp claim in the C.P.L. 330.30 motion, it appears that he framed his argument as a claim that the People had failed to fulfill the discovery obligations imposed by People v. Rosario, 9 N.Y.2d 286, 213 N.Y.S.2d 448, 173 N.E.2d 881 (N.Y.1961), codified at N.Y. C.P.L. § 240.45, by neglecting to turn over information regarding Kemp's criminal history. *Rosario* requires disclosure of all statements of a witness called at trial and is not limited to information which is favorable to the defense. It is true, as this Court noted above in this Decision and Order, that a *Rosario* violation is an issue of state law only because *Rosario* exceeds *Brady*'s disclosure requirements. However, the trial court, in addressing the C.P.L. 330.30 motion, recognized the issue as a *Brady* issue and analyzed it under *Brady* and the New York state counterparts to *Brady*. Thus, the trial court clearly was apprised that Valentin was raising a constitutional claim.

Furthermore, on direct appeal, Valentin's appellate counsel, Gary Muldoon, Esq., presented a thorough and well-reasoned analysis of the *Brady* claim, citing specifically to the *Brady* decision. Appellate counsel's brief relied on the pertinent federal case employing the appropriate constitutional analysis, asserted the claim in terms so particular as to call to mind the due process right at issue, and alleged a pattern of facts that was well within the mainstream of constitutional litigation (that is, the failure to disclose impeachment evidence favorable to the defense. It was plainly sufficient to fairly present Valentin's *Brady* claim for exhaustion purposes. *Accord*, *e.g.*, *Edkin v. Travis*, 969 F.Supp. 139, 142 (W.D.N.Y. 1997) (Larimer, D.J.) ("In the instant case, I find that Edkin exhausted his available state court remedies only in regard

to his *Brady* claim. Edkin's mere mention of the term *Brady*, in reference to Brady v. *Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963)–a pertinent federal case employing constitutional analysis–was sufficient to alert the state court to the federal constitutional nature of this claim.") (citing *Brown v. Williams*, 820 F.Supp. 64, 68 (W.D.N.Y.1993) (Skretny, D.J., adopting Report and Recommendation of Heckman, M.J.) ("In his state court appeal, Petitioner first argued that the failure of the prosecution to disclose the exculpatory information given by Mr. Evans to prosecutors prior to Petitioner's trial was reversible error under the constitutional doctrine set forth in such federal cases as *Brady* and *Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). This claim has been exhausted, since the factual and legal basis asserted adequately alerted the state courts to the federal constitutional nature of the claim."). And, the *Brady* claim involving Kemp was presented in his letter seeking leave to appeal to the New York Court of Appeals.

Finally, I note that every state court to have considered the *Brady* claims recognized them as issues of constitutional magnitude, as evidenced by the C.P.L. 330.30 Order, the C.P.L. 440.10 Order, and the Fourth Department's Decision and Order affirming Valentin's conviction.

There is no support in law or logic for respondent's argument. Valentin's due process claims concerning the non-disclosure of the criminal histories of Kemp and Bower are fully exhausted and are properly before this Court.

## V.     Standard of Review

Because Valentin's petition, filed in 2005, postdates the enactment of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub.L. No. 104-132, 110 Stat. 1214 (codified as amended in scattered titles of the U.S.C.), AEDPA's revisions of 28 U.S.C. § 2254

govern the proceeding. *Lurie v. Wittner*, 228 F.3d 113, 120-21 (2d Cir. 2000) (citing, *inter alia*,

*Williams v. Taylor*, 529 U.S. 362, 120 S.Ct. 1495, 1518, 146 L.Ed.2d 389 (2000)). The Second

Circuit has summarized the requirements placed upon a habeas petitioner by the AEDPA

standard as follows:

> Under AEDPA, to prevail on a petition for a writ of habeas corpus, a petitioner
> confined pursuant to a state court judgment must show that the court's
> "adjudication of the claim ... resulted in a decision that was contrary to, or
> involved an unreasonable application of, clearly established Federal law, as
> determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).
> "[C]learly established Federal law" refers to holdings of the Supreme Court, as
> opposed to dicta, as of the time of relevant state court decisions. *Carey v.
> Musladin*, 549 U.S. 70, 74-75, 127 S.Ct. 649, 166 L.Ed.2d 482 (2006); *Williams
> v. Taylor*, 529 U.S. 362, 412, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). A decision
> is "contrary to" federal law "if the state court arrives at a conclusion opposite to
> that reached by [the Supreme Court] on a question of law or if the state court
> decides a case differently than [the Supreme Court] has on a set of materially
> indistinguishable facts." *Williams*, 529 U.S. at 413, 120 S.Ct. 1495. An
> "unreasonable application" occurs when a "state court identifies the correct
> governing legal principle ... but unreasonably applies that principle to the facts of
> the [petitioner's] case." *Id.* "Unreasonableness is determined by an 'objective'
> standard." *Gersten v. Senkowski*, 426 F.3d 588, 607 (2d Cir.2005) (quoting
> *Williams*, 529 U.S. at 409, 120 S.Ct. 1495)..

*Friedman v. Rehal*, 618 F.3d 142, 152-153 (2d Cir. 2010) (Korman, D.J., sitting by designation)

The Supreme Court has stated that "unreasonableness" should not be conflated with "clear error"

because "[t]he gloss of clear error fails to give proper deference to state courts." *Lockyer v.

Andrade*, 538 U.S. 63, 75, 123 S.Ct. 1166, 155 L.Ed.2d 144 (2003). "[A] federal habeas court is

not empowered to grant the writ just because, in its independent judgment, it would have decided

the federal law question differently. The state court's application must reflect some additional

increment of incorrectness such that it may be said to be unreasonable." Aparicio v. Artuz, 269

F.3d 78, 94 (2d Cir.2001). However, "the increment need not be great; otherwise, habeas relief

would be limited to state court decisions so far off the mark as to suggest judicial incompetence." Francis S. v. Stone, 221 F.3d 100, 111 (2d Cir.2000) (internal quotation marks omitted).

"[A] 'state court adjudicates a state prisoner's federal claim on the merits when it (1) disposes of the claim on the merits, and (2) reduces its disposition to judgment.' " Jiminez v. Walker, 458 F.3d 130, 142 (2d Cir.2006) (quoting Sellan v. Kuhlman, 261 F.3d 303, 312 (2d Cir.2001) (quotation and alteration marks omitted)). Where a claim has been "adjudicated on the merits," 28 U.S.C. § 2254(d), "deference [is] mandated under AEDPA," Sellan, 261 F.3d at 310, in the federal habeas court's review of petitioner's claim.

All of the claims raised in Valentin's petition have been "adjudicated on the merits" for AEDPA purposes, as discussed further below. When a state appellate court affirms the denial of a claim without comment, this Court must look to the last "reasoned" state court opinion to determine and presume the state appellate court's reasoning." *Williams v. Goord*, 277 F. Supp.2d 309, 318 (S.D.N.Y. 2003) (citing *Ylst v. Nunnemaker*, 501 U.S. 797, 803, 111 S.Ct. 2590, 115 L.Ed.2d 706 (1991) ("[W]here the last reasoned opinion on the claim explicitly imposed a procedural default, we will presume that a later decision rejecting the claim did not silently disregard that bar and consider the merits."); *Hayes v. Coombe*, 142 F.3d 517, 519 (2d Cir.1998)). Here, the New York Court of Appeals denied leave to appeal without opinion; a habeas court presumes this indicates an agreement with the last reasoned state court opinion, i.e., the Appellate Division's decision on direct appeal.

The Appellate Division's decision on direct appeal constitutes an adjudication on the merits for purposes of applying the deferential standard set forth in 28 U.S.C. 2254(d), because that decision was the last reasoned opinion on the Kemp *Brady* claim; although Petitioner

applied for leave to appeal to the New York Court of Appeals, permission was summarily denied. *See Canteen v. Smith*, 555 F.Supp.2d 407, 416 & n.7 (S.D.N.Y. 2008) ("The Appellate Division's decision constitutes an adjudication on the merits, thereby triggering review under the deferential standard codified in Section 2254(d)" since "[t]he Appellate Division's decision [was] the last reasoned opinion on the Intent Charge Claim. Petitioner applied for leave to appeal to the Court of Appeals, but the Court of Appeals denied Petitioner's application.") (citation to state court opinion omitted).

With regard to the *Brady* claim involving Bower, and the claim of newly discovered evidence, the last reasoned state court opinion was the trial court's C.P.L. 440.10 Order, as to which the Appellate Division summarily denied leave to appeal. "For federal habeas purposes, '[t]he denial of leave to appeal by the Appellate Division without opinion is presumed to indicate an affirmation of the last reasoned state court decision. . . .'" *Garcia v. Scully*, 907 F.Supp. 700, 707 n.3 (S.D.N.Y. 1995) (quoting *Nowlin v. Senkowski*, No. 93 Civ. 7848 (KMW), 1995 U.S. Dist.Lexis 111 at * 9 n. 5, 1995 WL 7976 at * 5 n. 5 (S.D.N.Y. Jan. 5, 1995) and citing *Ylst v. Nunnemaker*, 501 U.S. at 803).

## VI.     Analysis of the Petition

### A.     Ground One: *Brady* Violation – Non-Disclosure of John Kemp's Criminal Record

*Brady* and its progeny impose a due process obligation on the prosecution to disclose material evidence in its possession that is favorable to the defendant. *Strickler v. Greene*, 527 U.S. 263, 280, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999); *Brady*, 373 U.S. at 87. There are three components to a *Brady* violation: (1) the government suppressed evidence, either willfully or

inadvertently; (2) the suppressed evidence was favorable to the defendant; and (3) the failure to disclose the evidence resulted in prejudice to the defendant. *Strickler*, 527 U.S. at 281-82; *see also United States v. Coppa*, 267 F.3d 132, 140 (2d Cir.2001). The *Brady* rule encompasses exculpatory and impeachment evidence. *United States v. Bagley*, 473 U.S. 667, 676 (1985); *Giglio v. United States*, 405 U.S. 150, 154-55 (1972). Kemp's criminal history clearly was *Brady* material in that it was relevant evidence to be used in impeaching the only testifying eyewitness to the robbery.

Although the Appellate Division correctly concluded that the prosecutor was charged with knowledge of Kemp's criminal history such that the prosecutor suppressed it for *Brady* purposes, respondent stubbornly clings to its argument that there was no suppression because the prosecutor had no duty to learn of this information. It is well-established that the "suppression" prong of *Brady* can be demonstrated in several ways–where the prosecution (1) introduces testimony that it knows, or should know, is perjury; (2) does not honor a defense request for specific exculpatory evidence; or (3) *fails to volunteer exculpatory evidence not requested by the defense*, or requested only generally. *Kyles*, 514 U.S. at 433. "[C]ourts, including the Supreme Court, have imputed knowledge of *Brady* material to prosecutors when the evidence is known only to prosecutorial personnel (including fellow prosecutors in the same office) or government agents investigating the particular case." *Chandras v. McGinnis*, No. 01 Civ. 2519(LBS), 2002 WL 31946711, at *7 (E.D.N.Y. Nov. 13, 2002) (citing *Kyles*, 514 U.S. at 438 (police investigator); *Giglio*, 405 U.S. at 154 (fellow prosecutor); *United States v. Thornton*, 1 F.3d 149, (3d Cir.1993) (Drug Enforcement Administration agents); *United States v. Morell*, 524 F.2d 550, 554-55 (2d Cir. 1975) (Federal Bureau of Investigation agent supervising confidential

informant); *Pennsylvania v. Ritchie*, 480 U.S. 39, 57, 107 S.Ct. 989, 94 L.Ed.2d 40 (1987) (assuming, *sub silentio*, that a state prosecutor had constructive knowledge of information in state child services division's investigative files; assuming without discussion that state prosecutor's office had imputed knowledge of information available to state child services division's investigative officers, even though prosecutor had no actual knowledge of information). In addition, a number of courts have found that prosecutors "suppressed" evidence "by failing to search for background information, such as a witness's criminal history, that is readily available through routine investigation of the prosecution's files or the files of other government agencies." *Chandras*, 2002 WL 31946711, at *7 (citing *Crivins v. Roth*, 172 F.3d 991, 997-98 (7th Cir.1999); *Hollman v. Wilson*, 158 F.3d 177, 181 (3d Cir.1998); *United States v. Brooks*, 966 F.2d 1500, 1502 (D.C. Cir.1992); *United States v. Auten*, 632 F.2d 478, 481 (5th Cir.1980); *United States v. Coppa*, 267 F.3d at 140 (interpreting *Kyles* to require the Government actively to seek *Brady* material "in its files and in the files of related agencies reasonably expected to have possession of such information")). In short, ostrich-like behavior on the part of the prosecution is not tolerated by *Brady* and its progeny.

*Kyles* rejected the compartmentalized, "hear no evil, see no evil, speak no evil" approach to which the prosecutor here subscribed. In *Kyles*, the state "suggested below that it should not be held accountable under *Bagley* and *Brady* for evidence known only to police investigators and not to the prosecutor" but the Supreme Court disagreed, holding that "[t]o accommodate the State in this manner would, however, amount to a serious change of course from the *Brady* line of cases." Although it could not be doubted that "police investigators sometimes fail to inform a prosecutor of all they know," "neither is there any serious doubt that 'procedures and regulations

can be established to carry [the prosecutor's] burden and to insure communication of all relevant information on each case to every lawyer who deals with it.'" *Id*. (quoting *Giglio v. United States*, 405 U.S. at 154).

The *Kyles* court reasoned that since prosecutor has the means to discharge the government's Brady responsibility, any argument "for excusing a prosecutor from disclosing what he does not happen to know about, boils down to a plea to substitute the police for the prosecutor, and even for the courts themselves, as the final arbiters of the government's obligation to ensure fair trials." *Id. Kyles* made clear that this is not to be countenanced.

Faced with the state's complaints about having to make difficult judgments about what should be disclosed as *Brady* material, the Supreme Court in *Kyles* stated that, "naturally, . . . a prosecutor anxious about tacking too close to the wind will disclose a favorable piece of evidence," *id.* at 440 (citation omitted), which was "as it should be" given the prosecutor's position as "'the representative . . . of a sovereignty . . . whose interest . . . in a criminal prosecution is not that it shall win a case, but that justice shall be done [.]'" *id.* (quoting *Berger v. United States*, 295 U.S. 78, 88, 55 S.Ct. 629, 79 L.Ed. 1314 (1935)).

As the Appellate Division found, the prosecutor in Valentin's case was wholly ignorant of the mandates of *Brady*. The prosecutor firmly believed that he had no due process or ethical obligation to learn of impeachment material regarding the People's witnesses, telling the judge, "I don't make it a practice to find the information [about whether a witness has a criminal history]. It's not that I don't want to know or did want to know." *Id.* at 5. In light of these precedents, respondent is starkly wrong in continuing to argue that the prosecutor did not have constructive knowledge Kemp's criminal record such that he could not have "suppressed" it in

violation of his due process obligations.  All of Kemp's five prior convictions were from courts in Monroe County, and one conviction occurred during the trial prosecutor's tenure at the Monroe County District Attorney's Office.  *See* C.P.L. 330.30 Tr. at 4-5. Clearly, under the circumstances here, knowledge of Kemp's criminal history was imputable to the prosecutor. However, the prosecutor obdurately refused to recognize his due process and ethical obligations under *Brady* and most definitely "suppressed" Kemp's criminal record.  The Appellate Division was correct in concluding that the "suppression" aspect of this claim had been established.

The question of whether the materiality prong of the *Brady* test has been met is not so clear-cut. Interestingly, the People, on direct appeal, did not make any specific argument regarding the materiality or lack thereof of this impeachment evidence, stating, without reference to any particular proof or precedent, that any *Brady* error "must necessarily be considered harmless in light of the remaining evidence." People's Appellate Brief at 6, Resp't App. "D". Valentin's appellate counsel did not make any argument explaining how there would have been a reasonable probability of a different result had Kemp's two felony and three misdemeanor convictions been used to impeach his credibility.

The prosecutor, in opposing the post-verdict C.P.L. 330.30 motion, advanced several arguments as to why Kemp's prior convictions did not affect the jury's assessment of his credibility as a witness or its verdict against Valentin. First, the prosecutor argued, Kemp was "impeached about as much as any witness could be" given trial counsel's vigorous questioning of him regarding an eight-year-old brain injury which required medication and subjected Kemp to seizures and anxiety attacks. Second, the prosecutor describes Kemp as an "innocent bystander"–not a victim of the robbery, apparently because he was not an official employee of

the store–who had no demonstrable stake in the outcome of the trial or any pecuniary interest either. Third, the prosecutor argued that the jury heard Petitioner's confession to his ex-girlfriend about his involvement in the robbery. This contended that this evidence was enough, standing alone, to convict Valentin at least as an accomplice to armed robbery. Furthermore, the prosecutor noted, Valentin confessed–perhaps unwittingly–to accomplice liability in his statement to the police when he conceded that he drove the other suspect (the elusive "Karl") to the site of the robbery, was present during the robbery, and driving the getaway car. The prosecutor also discounted the importance of Kemp's two felony convictions for sexual abuse, noting that the convictions were twenty-years-old at the time of trial.

The Appellate Division held that although Kemp's criminal record was Brady material and had been suppressed by the prosecution, he was not prejudiced because there was no reasonable probability of a different result. Because the Appellate Division adjudicated this claim on the merits, I review its conclusion pursuant to AEDPA. There is no indication in the Appellate Division's decision that it applied a standard that was "contrary" to Supreme Court holdings. 28 U.S.C. § 2254(d)(1). *Boyette v. Lefevre*, 246 F.3d 76, 91-92 (2d Cir. 2001). Rather, the Appellate Division applied the *Bagley* materiality standard–therefore, this Court can set aside its conclusion only if it constitutes an unreasonable application of Supreme Court holdings to the facts of this case. *Id.*

The Second Circuit in *Boyette* provided an overview of the well-established propositions that guide a materiality analysis. *Id.* (citing *Kyles*, 514 U.S. at 424.

> First, "a showing of materiality does not require demonstration by a
> preponderance that disclosure of the suppressed evidence would have resulted
> ultimately in the defendant's acquittal." *Kyles v. Whitley*, 514 U.S. 419, 434, 115

S.Ct. 1555, 131 L.Ed.2d 490 (1995). Instead, the court must determine whether, in the absence of the undisclosed evidence, the accused "received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Id.* Second, the "defendant need not demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict." *Id.* at 434-35, 115 S.Ct. 1555. Third, "once a reviewing court . . . has found constitutional error, there is no need for further harmless-error review." *Id.* at 435, 115 S.Ct. 1555. Fourth, the reviewing court must consider the suppressed evidence "collectively, not item by item." *Id.* at 436, 115 S.Ct. 1555.

*Boyette*, 246 F.3d at 91-92.

Applying the *Kyles* principles, I find that the Appellate Division's conclusion that there was no reasonable probability of a different result but for the prosecution's *Brady* violation constitutes an objectively unreasonable application of Supreme Court precedent to the facts of this case.

First, the only eyewitness to the robbery who *testified* at trial was Kemp. As noted above, McLaurin, the other eyewitness, had left the jurisdiction and was not amenable to process. According to the prosecutor, McLaurin intended–for some unexplained reason–to be uncooperative with regard to the Valentin trial.

As the trial judge noted at the C.P.L. 330.30 hearing, it was extremely troublesome that McLaurin testified in the grand jury that co-defendant *Arroyo* had the gun–not Valentin. C.P.L. 330.30 Tr. at 7. Kemp, however, did not testify at the grand jury proceeding. Then, Arroyo's indictment was dismissed because McLaurin was unavailable to testify and because Justice Fisher concluded that Kemp's identification of Valentin as the gunman was so unreliable that it had to be suppressed. Justice Fisher concluded that Kemp did not have an independent basis for making an in-court identification and "probably should not be sworn to testify at trial." Justice Fisher made detailed observations Kemp's demeanor at the Arroyo independent source hearing.

Even a cold trial transcript bears out Justice Fisher's description of Kemp's cognitive and memory deficiencies, confusion, inarticulateness, and tentativeness about the identification. These were all manifest upon this Court's reading of his testimony.

Kemp was the only witness who "put the gun" in Petitioner's hand. The prosecution makes much of the fact that Valentin's statement to the police and his confession to his ex-girlfriend, Bower, were sufficient to convict him as an accomplice to the robbery, even if the jury disbelieved that Valentin had the gun. However, to show materiality under *Brady* does "not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal." *Kyles v. Whitley*, 514 U.S. at 434. The Supreme Court made clear in *Kyles* that a "defendant need not demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict." *Id*. at 434-35, 115 S.Ct. 1555. The prosecution, and, most importantly, the state court, erroneously and unreasonably performed a "sufficiency of the evidence" review in deciding the materiality issue. The Supreme Court in *Kyles* instructed that materiality does translate into evidentiary sufficiency for a guilty verdict. *See id.*

Trial counsel had significant impeachment material against Kemp–namely, his cognitive deficiencies and his tentative and apparently inconsistent identification testimony. Kemp came across as an unsure, defensive, and at times incomprehensible witness. The prosecution argues that Kemp could not have been impeached any more–but this is disingenuous, given the prosecution's portrayal of Kemp as a "mild guy, all right, mild mannered," T.468, and elicited irrelevant testimony that Kemp was worried about his family during the robbery. The prosecutor also improperly and blatantly vouched for Kemp's credibility: "Maybe he's a shrinking violet,

okay? But he's believable, and he inherits [sic] the truth because he was there. And everything he says checks out, folks." T.471. Given the prosecutor's bolstering and attempt to enlist the jury's sympathy for Kemp, I disagree that Kemp's not insubstantial criminal history had only minimal impeachment value. As appellate counsel pointed out, Kemp was convicted of first degree sexual abuse (a D felony) and attempted first degree sexual abuse (an E felony) in 1981; child endangerment (an A misdemeanor) 1988; attempted assault (a B misdemeanor) in 1988; fourth degree criminal mischief in 1990 (an A misdemeanor); and fourth degree criminal mischief in 1999. The jury was entitled to hear about these criminal convictions and take them into account in determining Kemp's believability and veracity.

As the trial judge noted at the C.P.L. 330.30 motion, the issue of who had the gun–Arroyo, as claimed by the missing McLaurin, or Valentin, as claimed by Kemp, was "not a minor disagreement." As Judge Geraci stated,

> This goes to the very heart of this case. This is the significant factor regarding who walked in that store and who possessed the gun, isn't that a significant difference between what you had presented to a grand jury, and what you had a trial jury [on] here in this courtroom[.]

C.P.L. 330.30 Tr. at 7.

Where, as here, the prosecution's case was more akin to a house of cards than a foundationally sound structure, it is more than reasonably possible that Kemp's criminal record could have been the card that toppled the house. It bears emphasizing that Kemp's testimony about Valentin having the gun and being the "lead robber" was not corroborated by any independent evidence. This Court finds, after reviewing the entirety of the record, that had the prosecution complied with its *Brady* obligations by disclosing Kemp's criminal record, his

credibility would have been significantly more compromised. Non-disclosure of this non-cumulative impeachment evidence has seriously undermined my confidence in the outcome of Kemp's trial. Thus, I conclude that the information was "material," and that Valentin has demonstrated a true *Brady* violation.

    **B.**    **Grounds Two, Three and Four: *Brady* Violation – Non-Disclosure of the Arrest Warrant and Criminal Complaint Filed Against Sarah Bower for Petit Larceny**

This claim was raised in support of Valentin's C.P.L. 440.10 motion, as noted above in this Decision and Order. The trial court found that at the time of her testimony at Valentin's trial, Bower only had been accused of having committed the crime of petit larceny in connection with stealing money out of the cash register at her former employer's; she had not yet been arrested or arraigned on that criminal complaint. C.P.L. 440.10 Order at 4, 5. Bower was not arraigned until over three months after the completion of Valentin's trial; and she was not convicted until four months after Valentin's sentencing, when she entered her guilty plea in July 2001, to a lesser charge (disorderly conduct, a violation). *Id.*

The trial court went on to find that the prosecutor did not have actual knowledge of the criminal matter involving Bower, nor could knowledge be imputed to him. The trial court held that Valentin failed to show either that the police officers who investigated the Bower incident were aware of any connection between Bower and Valentin, or that the prosecutor was aware of the pending petit larceny complaint against Bower. C.P.L. 440.10 Order at 6.

The Court is not convinced that the trial court's conclusion regarding the prosecutor's lack of knowledge was a correct, or even reasonable, application of clearly established Supreme

Court precedent concerning "suppression" and the inextricably intertwined question of prosecutorial awareness of the existence of *Brady* material. The Supreme Court has clearly established that *Brady*'s mandate extends beyond any particular prosecutor's *actual* knowledge: "[T]he individual prosecutor has a *duty to learn* of any favorable evidence known to others acting on the government's behalf in the case, including the police." *Kyles,* 514 U.S. at 437; *accord*, *e.g.*, *Youngblood v. West Virginia*, 547 U.S. 867, 869, 126 S.Ct. 2188, 165 L.Ed.2d 269 (2006) (*per curiam*). Thus, it is well-settled that suppression of evidence may also occur if the prosecutor has only "constructive knowledge" of the *Brady* material's existence. *United States v. Coppa*, 267 F.3d 132, 140 (2d Cir.2001) ("[A] prosecutor can 'suppress' evidence even if he has acted in good faith and even if the evidence is 'known only to police investigators and not to the prosecutor.'") (quoting *Kyles v. Whitley*, 514 U.S. at 438)).

District courts in this Circuit have observed that "'the exact point at which government agents can fairly be categorized as acting on behalf of the prosecution, thus requiring the prosecutor to seek out any exculpatory or impeachment evidence in their possession, is uncertain.'" *United States v. Bin Laden*, 397 F. Supp.2d 465, 481 (S.D.N.Y.2005) (quoting *Chandras v. McGinnis*,  2002 WL 31946711, at *7 and citing *United States v. Zagari*, 111 F.3d 307, 320 n. 13 (2d Cir.1997) ("The extent to which knowledge may be imputed from one federal investigative agency to another for *Brady* purposes is as yet unclear.")). Here, the Court finds that the Monroe County District Attorney's Office and the Rochester Police Department are not so remote from each other as to preclude a finding that the prosecutor in Valentin's case had constructive knowledge of the pending arrest warrant against Valentin's ex-girlfriend Bower, one of the prosecutor's key witnesses. The Court thus finds that for *Brady* purposes, suppression of

the pending petit larceny complaint against Bower occurred.

The trial court held that even if knowledge could be imputed to the prosecutor, in the absence of any specific request for the impeachment material by Valentin's trial counsel, there was "no reasonable probability that a verdict would have obtained had the existing of the pending charge been disclosed to the defense." *Id.* (citation omitted). The trial court did not apply a standard "contrary to" clearly established Supreme Court precedent, but, in this Court's opinion, it unreasonably applied the *Bagley* materiality standard to the facts of this case.

As the Supreme Court instructed in *Kyles*, a reviewing court must consider the cumulative effect of all suppressed evidence favorable to the defendant rather than considering each item of evidence individually.  However, it appear that under the New York rules of evidence, the defense would not have been permitted to cross-examine Bower about her alleged stealing of money from her former employer because she had not been arrested or arraigned. *People v. Gottlieb*, 30 A.D.2d 202, 207, 517 N.Y.S.2d 978, 982 (App. Div. 1st Dept. 1987) ("First, the trial assistant was permitted to cross-examine the defendant with regard to an accusation. As set forth in Richardson [on Evidence], supra, at § 506: 'A witness cannot be asked whether he had been arrested or indicted, for an arrest or indictment is a mere accusation of guilt. *People v. Morrison*, supra, 195 N.Y. 116, 88 N.E. 21[4] . . . *People v. Cascone*, 185 N.Y. 317, 78

---

[4]	*People v. Morrison*, 195 N.Y. 116, 117-18, 88 N.E. 21, 21-22 (1909) (citation omitted) ("It is well settled in this state ... that a witness may not be impeached or discredited by showing on his cross-examination or in any other way that he has been indicted. An indictment is a mere accusation and raises no presumption of guilt. It is purely hearsay, for it is the conclusion or opinion of a body of men based on ex parte evidence. The rule applies to criminal actions as well as civil, and to all witnesses whether parties or not. As was said in a case decided as early as 1829: "The credibility of a witness is not to be impeached by proof of a particular offence, but by evidence of general bad character. If it was not competent to prove that the witness had perpetrated the offences for which he had been indicted, (of which there could be no question), it follows, of necessity, that the fact of his having been indicted was inadmissible evidence.")

N.E. 287 . . .' It makes no difference that the defendant was questioned, not about a prior arrest or indictment, but rather about the accusation of the alleged victim and a summons to attend a dispute resolution center based on that accusation. The vice of the questions addressed to defendant is precisely the same and arises from the obvious unfairness in permitting the credibility of the witness to be impeached on the basis of someone's accusation in an unrelated matter."); *accord*, *e.g. People v. Ochoa*, 798 N.Y.S.2d 347, 347, 4 Misc.3d 1030(A) (N.Y.Sup. Jun 28, 2004); *see also Stephen v. Hanley*, No. 03-CV-6226(KAM)(LB), 2009 WL 1471180, at *8 (E.D.N.Y. May 21, 2009) ("The court finds that these unproven charges and prior arrests are inadmissible for impeachment purposes. [Federal] Rule [of Evidnece] 609–which allows the admission of convictions, . . . is inapplicable because, none of the unproven charges resulted in convictions. Similarly, defendants' reliance on Rule 608, which allows the admission of "[s]pecific instances of the conduct of a witness, for the purpose of attacking or supporting the witness's character for truthfulness," is unavailing. None of the unproven charges or prior arrests bear on [defendant's] character for truthfulness and, thus, are also inadmissible pursuant to Rule 608) (citing *Michelson v. United States*, 335 U.S. 469, 482, 69 S.Ct. 213, 93 L.Ed. 168 (1948) ("Arrest without more does not . . . impeach the integrity or impair the credibility of a witness. It happens to the innocent as well as the guilty. Only a conviction, therefore, may be inquired about to undermine the trustworthiness of a witness."); internal citations omitted)).

Based upon this precedent, it does not appear that the information could have been used to impeach Bower. It follows that it could not have been "material" for *Brady* purposes. *Cf. Williams v. Burge*, No. Civ.A.9:02CV0695(DNH), 2005 WL 2179423, at *10 (N.D.N.Y. Aug. 15, 2005) ("Accordingly, to the extent petitioner is arguing that the fact of the indictment could

have been used to impeach Harris, this argument is misplaced.") (citing, *inter alia*, *People v. Gottlieb,* 30 A.D.2d at 207); *accord Berry v. Ercole*, No. 06 CIV. 6957 DLC/THK, 2008 WL 6083919, at *30 (S.D.N.Y. Dec 19, 2008), *rejected on other grounds by* 2009 WL 1321906, *13 (S.D.N.Y. May 12, 2009).

### C. Ground Five: Newly Discovered Evidence of Actual Innocence

In support of the claim of newly discovered, Valentin submitted an affidavit from an acquaintance and former housemate, Richard Rolfe, who was the original title-holder of the maroon-colored Pontiac Grand Am–the getaway car driven by Valentin and the vehicle in which Bower testified that she saw items of stereo equipment that Valentin identified to her as stolen. Rolfe claimed that he had purchased the car for Valentin for unspecified "work related use" and that he was the owner of the speakers that Bower said had been stolen. Rolfe asserted that because the speakers had been "factory installed" they therefore were part of the car and could not be stolen property. Rolfe, however, failed to establish that the speakers which Bowers identified at trial were his and such a conclusion cannot be based upon the trial transcript.

Even if I were to accept Rolfe's Affidavit as true, it does not constitute newly discovered evidence sufficient to warrant a new trial. Valentin's "newly discovered evidence" claim goes only to his guilt or innocence, not to the constitutionality of his conviction. The Supreme Court has never held that newly discovered evidence relevant to the guilt of a state prisoner is a stand-alone ground for relief on federal habeas corpus., Herrera v. Collins, 506 U.S. 390, 400, 113 S.Ct. 853, 860 (1993) ("Claims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the course of the underlying state criminal proceeding.") (citing *Townsend*

*v. Sain*, 372 U.S. 293, 317, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963), for the proposition that evidence that could not have been presented in the state proceedings "must bear upon the constitutionality of the applicant's detention")); *Ortega v. Duncan*, 333 F.3d 102, 108 (2d Cir.2003); *Tirado v. Senkowski*, 367 F.Supp.2d 477, 490 (W.D.N.Y.2005) (Bianchini, M.J.). Because Valentin has not claimed any constitutional violation related to Rolfe's Affidavit, his newly discovered evidence-actual innocence claim is not cognizable on federal habeas review and is dismissed.

**VII.     Conclusion**

For the foregoing reasons, habeas relief is granted with regard to Valentin's *Brady* claim concerning John Kemp. The *Brady* claim concerning Sarah Bower is denied. Valentin's claim of actual innocence predicated upon the affidavit of Rolfe is denied. As to the Bower *Brady* claim and the actual innocence claim, the Court finds that Valentin has not made a "substantial showing of a denial of a constitutional right," 28 U.S.C. § 2253(c)(2) ("A certificate of appealability may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right."). Accordingly, no certificate of appealability shall issue on those claims.

Respondent is accordingly directed to expunge Valentin's convictions for first degree robbery and second degree robbery and release him from parole supervision within sixty days. This judgment is not stayed pending completion of appeal proceedings, if any. An attorney from the CJA Panel is appointed to assist Valentin in connection with further proceedings in this matter.

**IT IS SO ORDERED.**

/s/ Victor E. Bianchini

_____

VICTOR E. BIANCHINI
United States Magistrate Judge

Dated:      January 10, 2011
            Buffalo, New York.